## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

        Plaintiff,

  vs.                                 No. CR 05-856 MCA

**JOSE ROBERTO CARRIZALES-TOLEDO**,

        Defendant.

### MEMORANDUM OPINION AND ORDER
### DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** comes before the Court on Defendant Jose Roberto Carrizales-Toledo's *Motion to Suppress Evidence and Statements* [Doc. No. 12] filed on May 3, 2005. The Court held an evidentiary hearing on Defendant's motion in Las Cruces, New Mexico, on May 17, 2005.  Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court denies Defendant's motion based upon the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

1.    United States Border Patrol Agent Bernardo Ramirez was on duty on the Peterson Ranch in the general vicinity of Hachita, New Mexico, during the daylight hours

between approximately 9 a.m. and 10 a.m. on or about December 30, 2004, when the events described below occurred.

2.      Hachita is located in a rural, sparsely populated area in the "bootheel" region of the State of New Mexico approximately ten to fifteen miles northwest of the border between the United States and Mexico.

3.      Agent Ramirez knew that the Border Patrol has previously experienced alien traffic and illegal border-crossings in this area, including the seizure of a large load of marijuana approximately one week earlier.

4.      The Peterson Ranch Road is an unpaved, graded dirt road that runs in an east-west direction from the border with Mexico to an intersection with Highway 81 approximately 15 miles south of Hachita.

5.      Agent Ramirez knew that the Peterson Ranch Road has been used by people crossing the border illegally from Mexico, and that it is common for illegal border traffic to turn around and flee back toward Mexico when a Border Patrol vehicle is sighted.

6.      While traveling east toward the border with Mexico on the Peterson Ranch Road alone in his marked Border Patrol vehicle, Agent Ramirez encountered the owner of the Peterson Ranch and his family traveling in the opposite direction approximately three miles east of the intersection with Highway 81.

7.      Agent Ramirez inquired of the Peterson family whether he should expect to find any ranch personnel working further east on the ranch that day, and Mr. Peterson stated that no one else should be working further east on the ranch that day.

8.     After conversing with the Peterson family, Agent Ramirez continued to drive east on the Peterson Ranch road toward the border with Mexico.

9.     After traveling approximately one mile east of the site of his encounter with the Peterson family, Agent Ramirez saw a gray pickup truck traveling in the opposite direction.

10.     Agent Ramirez was familiar with the people who resided in the area, as well as the local ranch traffic in the area, and he did not recognize the gray pickup truck as a vehicle that he had seen before.

11.     As the gray pickup truck got closer to his Border Patrol vehicle, Agent Ramirez saw Defendant seated in the driver's seat of the truck and did not recognize him as a ranch worker or a local resident.

12.     The portion of the road where the agent encountered Defendant is wide enough for vehicles to pass one another safely as long as they do so slowly and carefully, pulling close to their respective sides of the roadway.

13.     The portion of the road where the agent encountered Defendant is not wide enough for an extended-cab pickup truck to make a U-turn or easily turn around, and the desert on either side of this portion of the road also is not easily amenable to such actions.

14.     Agent Ramirez testified that as Defendant approached him in the pickup truck, he pulled his Border Patrol vehicle to the side of the road, thereby leaving enough room to allow the oncoming pickup truck to pass him.

15.     Agent Ramirez testified that he pulled over as a courtesy and that it is common for local traffic in the area to pull over and talk as they pass one another on a rural dirt road in this manner.

16.     According to Agent Ramirez, the pickup truck continued to approach his parked Border-Patrol vehicle and then suddenly stopped about 25 feet away on the other side of the road, as if to let Agent Ramirez pass in his Border Patrol vehicle.

17.     Agent Ramirez testified that he never had the opportunity to pass Defendant's vehicle because before he could move his Border-Patrol vehicle any closer to Defendant's pickup truck, he observed Defendant take off his hat, look behind him, and then put the pickup truck in reverse, driving backwards away from the agent in an erratic, weaving manner.

18.     Agent Ramirez testified that he began following Defendant as Defendant drove the pickup truck backwards toward the border with Mexico, but then Defendant brought the pickup truck to a sudden stop after traveling approximately 100 yards.

19.     Defendant remembers these events differently.  According to Defendant, he did not attempt to evade the agent by reversing the direction of the pickup truck when he saw the Border Patrol vehicle in front of him.  Rather, Defendant claims that the Border Patrol agent got right in front of him and the two vehicles collided.

20.     In his testimony at the suppression hearing, Defendant could not explain exactly how the two vehicles came together and collided.  On direct exam, Defendant

testified that he pulled over and stopped the pickup truck when he saw the Border Patrol vehicle approaching him, but that the Border Patrol vehicle continued traveling toward him.

21.   On cross exam, Defendant testified that he moved over to the left side of the road and was going to pass the Border Patrol vehicle, and when asked to clarify whether his truck had come to a complete stop at that point, he said: "Well, it was a quick thing.  I don't know."

22.   Defendant also testified on cross-exam that the agent's vehicle was going very fast, yet he also admitted that the two vehicles collided with "just a tap."

23.   Agent Ramirez testified that the two vehicles stopped with their front bumpers just barely making contact with one another, which is consistent with Defendant's testimony that they collided with "just a tap."  According to the agent, however, this collision resulted from the suddenness of the pickup truck's action and the condition of the unpaved dirt road on which the vehicles were traveling, which caused his vehicle to skid to a stop on the dirt.

24.   Before the two vehicles made physical contact with one another, Agent Ramirez did not turn on his emergency lights or siren, utter any verbal commands, brandish a weapon, or make any showing of official authority.

25.   After both vehicles had come to a complete stop, Agent Ramirez observed that Defendant was sitting behind the wheel of the pickup truck with his hands up in a gesture of surrender.

26.   Agent Ramirez testified that this gesture was not prompted by any verbal commands or brandishing of a weapon.

27.     Defendant testified that he raised his hands because, when the two vehicles collided and came to a stop, the agent immediately drew his weapon and issued verbal commands while still inside the Border Patrol vehicle.

28.     Agent Ramirez testified that he did not unholster his weapon or issue any verbal commands until after he exited his Border Patrol vehicle and began walking toward the passenger-side door of the stationary pickup truck in which Defendant was seated.

29.     As Agent Ramirez approached the pickup truck on foot, he observed several square-shaped bundles wrapped in cellophane in plain view on the truck's passenger seat and floorboard area.  There was also a blanket partially covering additional bundles in the extended-cab area behind the front seats of the pickup truck.

30.     Based on his training and experience, Agent Ramirez identified the bundles he saw in the cab of the pickup truck as being consistent with the packaging used to ship marijuana across the border.

31.     The agent directed Defendant to unlock the passenger-side door of the pickup truck, and Defendant did so using the power-lock button located next to the driver's seat.

32.     From his vantage point beside the open passenger door of the pickup truck, the agent could plainly see and smell the bundles of marijuana in the cab of the truck.

33.     From this vantage point, the agent conversed with Defendant in Spanish, a language in which both individuals are fluent.

34.     Agent Ramirez testified that during this initial conversation, Defendant remained compliant with the agent's verbal commands to raise his hands, but Defendant had not yet been handcuffed or otherwise restrained.

35.     During this initial conversation, the agent asked Defendant what he was doing, and the agent heard Defendant respond by stating that he was trying to get back to Mexico because he did not want the agent to catch him with "all this stuff."

36.     Agent Ramirez then asked Defendant what he had with him, and Defendant responded that it was marijuana.

37.     After Defendant stated that he had marijuana with him, Agent Ramirez placed him under arrest, advised him of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and summoned other Border Patrol agents to the scene.

38.     Defendant knowingly and voluntarily waived his Miranda rights, and thereafter made incriminating statements about his involvement with the marijuana and his alien status.

39.     In these post-arrest statements, Defendant admitted that he crossed the border illegally and that he knew he was transporting marijuana.

40.     Although the differences between the testimony of the Defendant and Agent Ramirez appear to result from honest mistakes in recollection rather than deliberate efforts to misrepresent or conceal what happened, I find Agent Ramirez's testimony to be more consistent, plausible, and credible than Defendant's testimony with respect to how the two vehicles came to a stop, as well as the timing of the agent's show of authority and his initial conversation with Defendant.

41.     Although there are some minor inconsistencies between what is represented in the Government's response brief and Agent Ramirez's actual testimony at the suppression hearing, I attribute these inconsistencies to poor draftsmanship on the part of the United States Attorney's Office rather than an attempt by the Border Patrol agent to change his story or conceal facts.

42.     Based on the totality of the circumstances, Agent Ramirez's encounter with Defendant did not become a "seizure" within the Fourth Amendment until the front bumper of the agent's Border-Patrol vehicle made contact with the front bumper of Defendant's truck as the two vehicles came to a stop.

43.     Based on the totality of the circumstances, Agent Ramirez had reasonable suspicion to conduct an investigative detention of Defendant and the pickup truck by the time the two vehicles made contact with one another and came to a complete stop.

44.     Upon observing and smelling the marijuana in the bundles in the cab of the pickup truck, Agent Ramirez's suspicions ripened into probable cause to arrest Defendant, and to search and seize the pickup truck.

45.     Considering the totality of the circumstances, Defendant's statements were not taken in violation of his <u>Miranda</u> rights.

## II.    <u>LEGAL ANALYSIS AND CONCLUSIONS OF LAW</u>

Defendant's motion to suppress presents three interrelated issues of constitutional importance.  The first issue is when Agent Ramirez's encounter with Defendant became a "seizure" requiring legal justification under the Fourth Amendment.  Defendant contends that

he was seized in an investigative stop from the outset because he alleges that the agent blocked the road and then approached Defendant's vehicle in a show of official authority. The Government denies this contention and asserts that Defendant began reversing and weaving his vehicle in an evasive and suspicious manner before the agent made any show of official authority.

The second issue is whether Agent Ramirez had developed a reasonable suspicion of criminal wrongdoing by the time he "seized" Defendant within the meaning of the Fourth Amendment.  Defendant maintains that he did not do anything to generate such a suspicion before the agent blocked the road and effectively seized him and his vehicle.  According to the Government, however, the situation did not become an investigative detention until after Defendant had engaged in evasive or suspicious maneuvers, and such maneuvers, when taken in the context of the other circumstances known to the agent, provided the legal justification for the investigative detention that followed.

The third issue is whether Agent Ramirez exceeded the permissible scope of an investigative detention by unholstering his weapon and questioning Defendant about what he was doing before any <u>Miranda</u> warnings had been given.  Defendant contends that he was effectively under arrest and in custody at the moment the agent unholstered his weapon and, therefore, the agent could not lawfully elicit incriminating statements from him without first administering <u>Miranda</u> warnings.  The Government denies that <u>Miranda</u> warnings were required to be given before the agent's initial conversation with Defendant because Defendant had not yet been handcuffed and taken into custody at that time.  The Government

also points out that Defendant was given <u>Miranda</u> warnings after he was taken into custody and that he continued to make incriminating statements after these warnings were issued.

I first address the timing of the investigative detention and then turn to whether the investigative detention was justified by a reasonable suspicion that criminal activity was afoot, and whether the agent's initial conversation with Defendant remained within the permissible boundaries of an investigative detention.   I conclude that the situation did not become a seizure until after the agent observed Defendant engage in evasive or suspicious behavior, and that under the totality of the circumstances, this behavior provided reasonable suspicion supporting an investigative detention of Defendant and his vehicle.   I further conclude that the agent did not exceed the permissible scope of an investigative detention during his initial conversation with Defendant and that the agent had already developed probable cause to arrest Defendant and search the pickup truck before Defendant made any incriminating statements.  It follows that there is no basis to invoke the exclusionary rule, and Defendant's motion to suppress must be denied.

### A.   <u>The Timing of the Investigative Stop</u>

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness." <u>United States v. Chadwick</u>, 433 U.S. 1, 12 (1977), <u>overruled in part on other grounds</u>, <u>California v. Acevado</u>, 500 U.S. 565 (1991).

Defendant has standing to challenge the seizure of his person regardless of his possessory interest or property interest in the truck he was driving, see United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996), and it is the Government's burden to show that this warrantless seizure was reasonable, see United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993).  If the Government cannot meet this burden, then the evidence obtained as a result of the seizure must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure.  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

For purposes of analyzing Fourth Amendment issues, the Tenth Circuit has divided interactions between police and citizens into three categories:  consensual encounters, investigative stops, and arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See id.  Such encounters "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Id.  Thus, for example, an officer generally may approach a stationary vehicle on a public roadway to question its occupant or observe what is in plain view without implicating the Fourth Amendment.  See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).

An encounter between a law-enforcement officer and a citizen is no longer consensual when there has been a show of official authority that would cause a reasonable person to

believe he or she is not free to leave.  See Florida v. Royer, 460 U.S. 491, 502 (1983)

(plurality opinion); accord United States v. Maez, 872 F.2d 1444, 1450 (10th  Cir. 1989).

> Courts have identified several factors that could lead a reasonable innocent
> person to believe that he is not free to disregard the police officer, including:
> the threatening presence of several officers; the brandishing of a weapon by
> an officer; some physical touching by an officer; use of aggressive language
> or tone of voice indicating that compliance with an officer's request is
> compulsory; prolonged retention of a person's personal effects such as
> identification and plane or bus tickets; a request to accompany the officer to
> the station; interaction in a nonpublic place or a small, enclosed place; and
> absence of other members of the public.

Sanchez, 89 F.3d at 718; accord United States v. Williams, 356 F.3d 1268, 1274 (10th Cir.),

cert. denied, 125 S. Ct. 264 (2004).

The determination whether an encounter is no longer consensual "is based on how a

reasonable person would understand the situation." United States v. Rogers, 391 F.3d 1165,

1169 (10th Cir. 2004).  "This reasonable person 'does not have a guilty state of mind and

does not have peculiar mental or emotional conditions that are not apparent to the

questioning officer.'"  Id. (quoting United States v. Erving L., 147 F.3d 1240, 1247 (10th

Cir. 1998)); see Williams, 356 F.3d at 1275 (emphasizing that the "reasonable person" test

presupposes an innocent person).  The subjective state of mind of the suspect or the officer

"is wholly irrelevant and plays no role in [the Court's] evaluation of the circumstances

surrounding the encounter." United States v. Abdenbi, 361 F.3d 1282, 1292 (10th Cir.), cert.

denied, 125 S. Ct. 197 (2004).  Thus, it is a "critical error" for a district court to rely on such

subjective impressions in determining whether an encounter between an officer and a suspect

has become a "seizure" under the Fourth Amendment.  See Rogers, 391 F.3d at 1170.

-12-

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  Oliver, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

A seizure that exceeds the limited scope or duration of an investigative detention may nevertheless be justified as an arrest.  An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'"  Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994); accord Royer, 460 U.S. at 499.

Inasmuch as an arrest exceeds the limited scope or duration of an investigative stop, it must be supported by probable cause.  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  <u>Romero v. Fay</u>, 45 F.3d 1472, 1476 (10th Cir. 1995)).  "[T]he standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'"  <u>Atwater v. City of Lago Vista</u>, 532 U.S. 318, 354 (2001) (quoting <u>Dunaway v. New York</u>, 442 U.S. 200, 208 (1979)).

The probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  <u>United States v. Pollack</u>, 895 F.2d 686, 691 (10th Cir. 1990) (quoting <u>Adams</u>, 407 U.S. at 148-49).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe '*an* offense' had been committed."  <u>United States v. Edwards</u>, 242 F.3d 928, 935 (10th Cir. 2001) (quoting <u>United States v. Maher</u>, 919 F.2d 1482, 1485 (10th Cir. 1990)).

Probable cause is an objective standard, and thus the individual officer's subjective belief whether there is probable cause to arrest is not dispositive.  <u>See</u> <u>United States v. Davis</u>, 197 F.3d 1048, 1051 (10th Cir. 1999) (citing <u>Royer</u>, 460 U.S. at 507).  Furthermore, "[t]hat an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by probable cause."  <u>United States v. Santana-Garcia</u>, 264 F.3d 1188, 1192 (10th Cir. 2001) (citing <u>Royer</u>, 460 U.S. at 507).

Applying these standards to my findings of fact in this case, I determine that Defendant was not "seized" within the meaning of the Fourth Amendment until the front of the agent's vehicle made contact with the front of the pickup truck as the two vehicles came to a complete stop.  Prior to that stop, the agent had not engaged in any show of official authority that would cause a reasonable innocent person to believe that he or she was not free to leave.

In related contexts, the Supreme Court and the Tenth Circuit have rejected the proposition that the mere presence of uniformed officers carrying holstered weapons is coercive *per se*.  See United States v. Drayton, 536 U.S. 194, 204-05 (2002); Abdenbi, 361 F.3d at 1288.  For similar reasons, I conclude that the mere presence of a uniformed Border Patrol agent in a marked Border Patrol vehicle parked on the side of a ranch road, or traveling in the opposite direction on such a road, does not present a threat, or amount to a show of official authority, that would cause a reasonable innocent person to believe that he or she is not free to leave the scene.  While Defendant may have subjectively felt some threat from the presence of the agent's vehicle--especially given his awareness that he was in the country illegally and carrying a load of marijuana--such subjective impressions are not relevant to the Court's Fourth Amendment analysis.  See Rogers, 391 F.3d at 1169-70; Abdenbi, 361 F.3d at 1292.

Considering the factors articulated in Sanchez, 89 F.3d at 718, I note that at the time the two vehicles approached one another, the agent did not brandish a weapon, physically restrain Defendant, retain any of Defendant's personal effects, make any request for

Defendant to accompany him to the border-patrol station, or use any aggressive language or other mode of communication such as emergency lights, sirens, or megaphones.  In addition, the encounter occurred on an open roadway surrounded by ranch land, which does not qualify as a small, enclosed, or nonpublic place.  The road was wide enough for the two vehicles to pass one another so long as they did so slowly and carefully, and Defendant was not fenced in or blocked from behind.

Thus,  under the totality of the circumstances, I conclude that no seizure had occurred at the time the two vehicles approached one another, and thus the agent did not need any legal justification to observe and approach Defendant's pickup truck from the vantage point of his Border Patrol vehicle.  Rather, Defendant and his pickup truck were not seized until the pickup truck made physical contact with the agent's Border Patrol vehicle as the two vehicles came to a stop in front of each other.

### B.      The Reasonableness of the Agent's Suspicions

By the time the agent's Border-Patrol vehicle made physical contact with Defendant's pickup truck as the two vehicles came to a stop in front of each other, Agent Ramirez had developed the reasonable suspicion necessary to justify a brief investigative detention.  In the special context of patrolling the border, the Supreme Court and the Tenth Circuit have developed a list of factors to be considered in determining whether reasonable suspicion of criminal activity is present.  These factors include:

> "(1) characteristics of the area in which the vehicle is encountered;  (2) the proximity of the area to the border;  (3) the usual patterns of traffic on the particular road;  (4) the previous experience of the agent with alien traffic;  (5)

information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments;  and (8) the appearance that the vehicle is heavily loaded."

United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (quoting United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003)); accord United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975).

Although guided by these factors, "the ultimate assessment of reasonable suspicion depends on the totality of the circumstances." Gandara-Salinas, 327 F.3d at 1130.  Thus, the Court cannot subdivide its analysis into separate findings that each factor, when viewed in isolation from the rest, is readily susceptible of an innocent explanation.  See United States v. Arvizu, 534 U.S. 266, 274 (2002); accord Gandara-Salinas, 327 F.3d at 1130.  Rather, the Court's analysis must recognize that reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'"  United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994) (quoting Terry, 392 U.S. at 22).

"In examining the totality of the circumstances, '[c]ommon sense and ordinary human experience are to be employed,' and 'deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" United States v. De La Cruz-Tapia, 162 F.3d 1275,  1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)).  In particular, the Court must "accord deference to the agent's ability to 'draw on [his] own experience and specialized training to make inferences

-17-

from and deductions about the cumulative information available to [him] that might well elude an untrained person.'" Gandara-Salinas, 327 F.3d at 1130 (quoting Arvizu, 534 U.S. at 273).

An agent cannot, however, predicate an investigative detention solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946. Although it is "possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" Id. (quoting Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)).

In this case, the relevant factors when viewed in light of the totality of the circumstances add up to a reasonable suspicion that criminal activity was afoot. The stop occurred in a sparsely populated rural area on a dirt road leading directly from the border with Mexico, which was only twelve to fifteen miles east of the site of the stop, according to the agent's testimony. The Border Patrol has previously experienced alien traffic and illegal border-crossings in the area, including the interdiction of a large load of marijuana approximately one week before the stop of Defendant's vehicle. Although travel through this area could be susceptible to an innocent explanation, and indeed most local traffic in the area may be legitimate, the available information concerning the location of the stop and the pattern of prior illegal activity in the area weighs in favor of the conclusion that the agent's

suspicions about Defendant were reasonable.  See Gandara-Salinas, 327 F.3d at 1130; Quintana-Garcia, 343 F.3d at 1271-73.

Agent Ramirez also personally observed and ascertained specific details about the driver's behavior in relation to the usual traffic patterns in the area that contributed to the reasonableness of his suspicions.  In particular, the agent was familiar with the local residents, vehicles, and traffic patterns in the area, including the manner in which they typically interact when passing one another on the Peterson Ranch Road.  Shortly before his encounter with Defendant, the agent had spoken with the Peterson family, who lived in the immediate area, and ascertained from them that no ranch workers were expected to be working further east toward the border with Mexico that day.

When considered in the context of the agent's training and experience in patrolling the rural roads of southern New Mexico, his observations and the information he obtained from the Peterson family support the conclusion that the presence of Defendant's truck traveling westbound from the border with Mexico on the Peterson Ranch Road was out of the ordinary and inconsistent with the traffic patterns of legitimate travelers.  Although Agent Ramirez was familiar with the local residents and their vehicles, he did not recognize Defendant or the gray pickup truck as he initially approached them in his Border Patrol vehicle, and he did not expect to see any legitimate local traffic in the area based on the Peterson's representations.  Further, Defendant did not react in the same way that legitimate traffic typically reacts when seeing a Border-Patrol vehicle parked on the side of the road in front of them or traveling toward them.  While the unusual actions of an unfamiliar vehicle

may have less significance on an interstate highway or in an area that is more heavily populated or further away from the border with Mexico, in the specific context presented here, which involves a sparsely populated ranch road leading directly from the border with Mexico, this factor supports the conclusion that the agent's suspicions were reasonable.

The Court also must consider other information available to the agent concerning the Defendant's behavior, including whether the agent observed Defendant engage in any obvious attempts to evade him.  See Quintana-Garcia, 343 F.3d at 1273.  In this case, the parties sharply dispute whether Defendant engaged in any obvious evasive action prior to the stop.  To resolve this dispute, the Court must evaluate the agent's compliance with the Fourth Amendment from an objective standpoint based on the information available to him at the time.  See Arkansas v. Sullivan, 532 U.S. 769, 771-72 (2001); Sanchez, 89 F.3d at 718.  From this standpoint, Defendant's actions could reasonably and objectively be viewed as evasive or suspicious, even if Defendant did not subjectively intend to evade the agent.  From the agent's perspective, Defendant appeared to stop his truck, reverse direction, and move away from the agent's vehicle in an abrupt and erratic manner even though the agent had not yet blocked his path or made any show of official authority, such as engaging his emergency lights or siren or issuing verbal commands.  The agent's observation of such maneuvers in response to Defendant's sighting of his Border Patrol vehicle supports the reasonableness of the agent's suspicions.  See Quintana-Garcia, 343 F.3d at 1273.

The final factors to be considered are those relating to the characteristics of the vehicle in which Defendant was traveling.  The significance of these factors is limited in this

case because the actions leading up to the stop occurred in a relatively short time frame, such that the agent did not have a lengthy opportunity to make observations about the characteristics of the truck Defendant was driving before it came to a stop.  Indeed, the agent testified that he was attempting to get closer to the pickup truck so he could get a better view when the truck suddenly stopped.  Given that the pickup truck was a full-sized model with an extended cab, however, the agent could have reasonably suspected that it was an "effective smuggling vessel."  Id. at 1274.  These suspicions were soon confirmed when Agent Ramirez approached the vehicle and observed that the cab of the truck was heavily loaded with cellophane-wrapped bundles which, based on his training and experience, were consistent the packaging used to smuggle marijuana.  It follows that when all of the relevant factors are considered in the aggregate, Agent Ramirez possessed a reasonable suspicion that Defendant and his truck were involved in criminal activity at the time that the two vehicles came into physical contact with one another and the investigative detention began.

## C.   The Permissible Scope of the Investigative Detention

I next consider whether Agent Ramirez's actions remained within the proper scope of an investigative detention unless and until he developed the probable cause necessary to effectuate a full custodial arrest.  During a valid investigatory stop, the Fourth Amendment permits a Border Patrol agent to ask the person being detained to provide information about his or her identity and citizenship, respond to objectively reasonable concerns about the agent's safety, and explain suspicious circumstances, "but any further detention or search

must be based on consent or probable cause." Brignoni-Ponce, 422 U.S. at 881-82; see generally Holt, 264 F.3d at 1220-26, 1228-30.

An investigative detention based on reasonable suspicion does not necessarily preclude the use of certain security measures when there are objective, reasonable concerns about officer safety. See, e.g., Holt, 264 F.3d at 1223 (concluding that in light of an officer's "objective, reasonable basis to fear for his or her life every time a motorist is stopped," officers conducting routine traffic stops may order the driver and passengers to get out of the vehicle and to raise their hands during the stop); United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993) (concluding that it was not unreasonable under the circumstances for officers to execute an investigatory stop by drawing their weapons and ordering the defendant out of his car and onto the ground); Gallegos v. City of Colorado Springs, 114 F.3d 1024, 1030-31 (10th Cir. 1997) (concluding that it was not unreasonable under the circumstances for an officer to execute an investigatory stop by grabbing a suspect by the arm and placing him face down on the pavement). The legal justification for using such security measures during an investigative detention does not depend on whether a suspect actually intended to threaten an officer's safety or whether the officer actually felt threatened by the suspect's actions because "[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis." Sanchez, 89 F.3d at 718. Thus, the Court's analysis does not rely on whether Agent Ramirez actually felt threatened by Defendant's abrupt actions or whether Defendant's intentions were innocent.

The facts of this case establish a reasonable, objective basis for concerns about officer safety that made it permissible for Agent Ramirez to unholster his firearm and to make a brief visual search and verbal inquiry concerning what Defendant had with him in the cab of the pickup truck.  Such actions did not exceed the scope of the investigative detention. An officer has an "objective, reasonable basis to fear for his or her life every time a motorist is stopped," Holt, 264 F.3d at 1223, and in this instance Agent Ramirez was approaching the pickup truck under circumstances that are sufficiently similar to a traffic stop to warrant the same concerns about officer safety.  While "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a Terry stop[,]" Melendez-Garcia, 28 F.3d at 1053, in this case the agent's concerns about safety were justifiably heightened because he was the only law-enforcement officer at the scene, Defendant's truck was in a remote location near the border, and the pickup truck had made an abrupt and sudden stop that created an element of surprise, see Holt, 264 F.3d at 1223; Perdue, 8 F.3d at 1463; Gallegos, 114 F.3d at 1030-31.

Further, the events leading up to the seizure provided Agent Ramirez with a reasonable, objective concern that contraband, a weapon, or another person might be concealed in the truck's cab.  Such officer-safety concerns warranted a brief protective search of the truck's passenger compartment to ensure that all of its occupants had exited and that no weapons were present.  See Holt, 264 F.3d at 1223.  When Defendant opened the passenger-side door of the pickup truck to facilitate such a search, Agent Ramirez was lawfully in a position to observe and smell the marijuana that was wrapped in the cellophane

-23-

bundles in the truck's cab.  See Sanchez, 89 F.3d at 719.  Agent Ramirez's perceptions at that point established probable cause to arrest Defendant and to seize and search the truck and bundles, regardless of any questioning that followed.  See United States v. Castorena-Jaime, 285 F.3d 916, 924-25 (10th Cir. 2002); United States v. Vasquez-Castillo, 258 F.3d 1207, 1212-13 (10th Cir. 2001).

During an investigative detention involving a motor vehicle, law enforcement officers ordinarily are justified in inquiring about the presence of weapons in the vehicle and asking its occupant to explain the suspicious circumstances that prompted the stop in the first place.  See Holt, 264 F.3d at 1221-24.  The Court recognizes, however, that an investigative detention which falls short of an arrest nevertheless may prompt the need for Miranda warnings before a suspect is interrogated.  See, e.g., Perdue, 8 F.3d at 1463-65 (concluding that a suspect who was forced out of his car and onto the ground at gunpoint should have been given Miranda warnings before he was interrogated).

In the present case, Agent Ramirez was not required to inform Defendant of his rights under Miranda before asking Defendant what he was doing and what was in the truck's cab because, unlike the suspects in Perdue, 8 F.3d at 1464-65, Defendant had not been "neutralized" when this initial conversation took place.  On the contrary, Defendant remained out of Agent Ramirez's reach on the opposite side of the pickup truck where he had access to the contents of the truck's cab, some of which were still concealed from the agent.  In this kind of situation, the Supreme Court has recognized a public-safety exception to the requirements of Miranda.  See New York v. Quarles, 467 U.S. 649, 655-56 (1984); Holt, 264

F.3d at 1225.  Thus, the agent's brief initial questioning about what Defendant was doing and what was in the truck falls under the public-safety exception even if Defendant is deemed to be in custody at that time due to the agent's unholstering of his firearm.

Defendant was given Miranda warnings before the Border Patrol agents questioned him any further.  While Defendant's responses to the agent's questioning undoubtedly corroborated the agent's suspicions, these responses were not necessary to establish probable cause to arrest Defendant and to seize and search the pickup truck because the agent already had probable cause to perform such actions when he observed and smelled the bundles of marijuana in the truck's cab.  See New York v. Belton, 453 U.S. 454, 462 (1981); United States v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002).  For these reasons, Miranda does not provide a basis for suppressing the marijuana or any of Defendant's statements.  See United States v. Gell-Iren, 146 F.3d 827, 830-31 (10th Cir. 1998).  In sum, because the investigative detention, arrest, and search met the applicable requirements of the Fourth Amendment and Miranda, the exclusionary rule provides no basis for suppressing the evidence or statements that were produced as a result of these activities.

## III.   **CONCLUSION**

For the foregoing reasons, the agent's search and seizure of Defendant and his vehicle were reasonable, and there is no basis for excluding any of the evidence or statements obtained as a result of these actions.

**IT IS, THEREFORE, ORDERED** that Defendant Jose Roberto Carrizales-Toledo's

*Motion to Suppress Evidence and Statements* [Doc. No. 12] is **DENIED**.

**SO ORDERED** this 19th day of May, 2005, in Las Cruces, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge